## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

**RANDAL JENNINGS**                                                    **PLAINTIFF**
**Reg. #21384-045**

**V.**                              **NO. 2:22-cv-00047-JM-ERE**

**RYAN POYNOR,**
**AHSA**                                                                **DEFENDANT**

### RECOMMENDED DISPOSITION

**I.    Procedure for Filing Objections:**

This Recommendation has been sent to United States District Judge James M. Moody Jr. You may file objections if you disagree with the findings or conclusions set out in the Recommendation. Objections should be specific and include the factual or legal basis for the objection.

Objections must be filed within 14 days. If you do not object, you risk waiving the right to appeal questions of fact. If no objections are filed, Judge Moody can adopt this Recommendation without independently reviewing the record.

**II.    Introduction:**

*Pro se* plaintiff Randal Jennings, a federal inmate at Forrest City Low–Federal Correctional Institution ("FCL-FCI"), brings this action pursuant to *Bivens v. Six*

*Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[1] His only remaining claim[2] is that Defendant Ryan Poynor, former Assistant Health Services Administrator at FCL-FCI, demonstrated deliberate indifference to his serious medical needs. For his remedy, Mr. Jennings "requests relief this [C]ourt finds he is entitled to." *Doc. 12 at 5.*

Defendant Poynor has filed a motion for summary judgment, a supporting brief, and a statement of undisputed facts arguing that: (1) Mr. Jennings' medical deliberate indifference claim is not actionable under *Bivens*; and (2) if the Court extends *Bivens* to Mr. Jennings' claim, the undisputed material facts fail to create an issue of fact for trial, and Mr. Poyner is entitled to summary judgment on the basis of qualified immunity. *Docs. 56, 57, 58.* Mr. Jennings has responded to the motion (*Doc. 63, 64*), Defendant Poynor has replied to Mr. Jennings' response (*Doc. 67*), and Mr. Jennings has replied to Defendant Poynor's reply (*Doc. 71*). The motion is ripe for review.

For the reasons explained below, Defendant Poynor's motion for summary judgment (*Doc. 56*) should be granted.

---

[1] Mr. Jennings initiated this case with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. *Doc. 1.* Later, with Mr. Jennings' consent, the case was converted to a civil rights action pursuant to *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *Docs. 9, 10.*

[2] The Court previously dismissed all of Mr. Jennings' other claims against all other Defendants. *Doc. 17.*

### III.   **Discussion:**

### A.   **Summary Judgment Standard**

Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once that has been done, the nonmoving party must come forward with specific facts demonstrating that there is a material dispute for trial. See FED. R. CIV. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). A party is entitled to summary judgment if -- but only if -- the evidence shows that there is no genuine dispute about any fact important to the outcome of the case. See FED. R. CIV. P. 56; *Odom v. Kaizer*, 864 F.3d 920, 921 (8th Cir. 2017).

### B.    Undisputed Factual Background[3]

At all times relevant to this lawsuit, Defendant Poynor served as the Assistant Health Services Administrator ("AHSA") at FCL-FCI. *Doc. 58-3 at 1*. As ASHA, Defendant Poynor was responsible for assisting the Health Services Administrator in managing and supervising the administrative functions of the Health Services Department. *Id. at 1-2*. Defendant Poyner, who is not a licensed medical professional, lacked: (1) any supervisory insight over medical treatment decisions; (2) any clinical responsibilities; or (3) the authorization to order, administer, or distribute medications to FCL-FCI inmates. *Id. at 2*.

During the spring and summer of 2020, Defendant Poynor assisted in FCL-FCI's response to the COVID-19 pandemic. *Id*. In June 2020, FCL-FCI addressed its first major COVID-19 outbreak and attempted to identify and isolate from other prisoners those who had tested positive or been exposed to COVID-19. *Doc. 58-1 at 2. Id*. Initially, inmates who tested positive or were symptomatic were moved to Medical Observation Cells and instructed to take with them the property that they needed for 24 hours. *Id. at 3*.

---

[3] Unless otherwise specified, these facts are taken from: (1) Mr. Jennings' inmate history (*Doc. 58-2 at 6-11*); (2) his medication administration record (*Doc. 58-2 at 18*); (3) his prescription dispensing history (*Doc. 58-2 at 21-33*); (4) the Medical Observation Cell logbook (*Doc. 58-2 at 35-62*); (5) Defendant Poynor's declaration (*Doc. 58-3*); and (6) Mr. Jennings' administrative remedy papers (*Doc. 58-5*).

On June 29, 2020, FCL-FCI officials moved Mr. Jennings to a Medical Observation Cell. *Doc. 58-1 at 2*. Defendant Poynor was among the staff members who helped move inmates, including Mr. Jennings, to the Medical Observation Cells, but once the inmates were secured in the Medical Observation Cells, Defendant Poynor's involvement ended. *Doc. 58-3 at 3*. He was not responsible for supervising the inmates once they were secured, and he did not make rounds or otherwise monitor inmates assigned to the Medical Observation Cells. *Id. at 3-4*. As a non-clinical staff member, Defendant Poynor had no knowledge of Mr. Jennings' prescribed medications and played no role in prescribing, administering, or distributing medications to Mr. Jennings. *Id. at 3*.

When Mr. Jennings was transferred to the Medical Observation Cell, he had active prescriptions for the following daily medications: (1) aspirin 81 mg; (2) atorvastatin 10 mg; (3) ibuprofen 800 mg; (4) lisinopril 10 mg; (5) metformin 500 mg; and (6) omeprazole 20 mg. *Doc. 58-2 at 13-14*. Mr. Jennings also was prescribed an Albuterol inhaler 8.5 mg to be used "only AS NEEDED to treat/prevent asthma attack." *Id. at 13*.

Mr. Jennings' Medication Administration Record indicates that, on June 29, 2020, at 19:30 hours, a registered nurse provided Mr. Jennings two doses of aspirin, atorvastatin, lisinopril, metformin, and Motrin for "self carry." *Doc. 58-2 at 18*.

Therefore, Mr. Jennings would have had enough medication for the evening of June 29 and the morning of June 30.

Mr. Jennings' prescription dispensing history shows that, on June 29, at 19:43 hours, a registered nurse provided him one Albuterol inhaler. *Id. at 28*. In addition, the Medical Observation Cell Logbook for June 29, 2020, at 18:30 hours, notes "Inhaler given" to Mr. Jennings. *Id. at 37*.

According to Mr. Jennings' medical records, medical personnel consistently provided him all medications for the four days[4] he was assigned to the Medical Observation Cell. *Id. at 38-62*.

On July 3, 2020, Mr. Jennings was removed from the Medical Observation Cell. *Id. at 9*.

On July 8, 2020, Mr. Jennings submitted a Request for Administrative Remedy (also knowns as a BP-9) complaining that Defendant Poynor denied him medication while he was housed in the Medical Observation Cell. *Doc. 58-5 at 27*. Mr. Jennings did not specifically reference his asthma or his inhaler in that grievance. *Id*. In addition, he admitted that the same day he moved to the Medical Observation Cell, medical staff provided him some of his medications, and they provided him all of his medications within 24 hours. *Id*.

---

[4] Mr. Jennings was placed in the Medical Observation Cell on June 29, 2020 at 1318 hours and transferred out on July 3, 2020, at 0945 hours. *Doc. 58-1 at 2*.

## C.    *Bivens* Framework and Application

"[A] *Bivens* action is the federal analog to suit brought against state officials under . . . 42 U.S.C. § 1983." *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006). A claim under *Bivens* is similar to an action under 42 U.S.C. § 1983, "except that the former is maintained against federal officials while the latter is against state officials." *Sanchez v. United States*, 49 F.3d 1329, 1330 (8th Cir. 1995) (per curiam). The Supreme Court has recognized an implied cause of action under *Bivens* on only three occasions: (1) the *Bivens* case itself, which involved an allegedly unlawful arrest and warrantless search in violation of the Fourth Amendment; (2) *Carlson v. Green*, 446 U.S. 14 (1980), which involved a failure to treat a prisoner's asthma resulting in his death in violation of the Eighth Amendment; and (3) *Davis v. Passman*, 442 U.S. 228 (1979), which involved gender discrimination in violation of Fifth Amendment due process rights. See *Farah v. Weyker*, 926 F.3d 492, 497-98 (8th Cir. 2019) (citing *Bivens*, *Carlson*, and *Passman* as the only occasions the Supreme Court has implied a cause of action under *Bivens*).

More recently, the Supreme Court warned that while "*Bivens* is well-settled law in its own context . . . expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017). The Supreme Court has "consistently refused to extend *Bivens* to any new context or new category of defendants . . .." *Id*. (internal citation omitted). "[F]or almost 40 years, [the Supreme

Court] [has] . . . rebuffed requests to add to the claims allowed under *Bivens*."
*Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020). Instead, "private rights of action to
enforce federal law must be created by Congress." *Id. at 742* (internal citation
omitted).

Courts apply a two-step analysis to determine whether a plaintiff may proceed
with a proposed *Bivens* claim. *Farah,* 926 F.3d at 498. First, the Court must
determine whether a proposed claim is "the type for which a *Bivens* remedy is
[presently] available." *Id. at 497*. If no previously recognized *Bivens* claim is
alleged, and the plaintiff seeks to expand *Bivens*, the Court must determine whether
"special factors counsel[ ] hesitation" in extending *Bivens* to the proposed claim. *Id.
at 498* (omitting internal quotations). The Supreme Court recently explained that this
two-step "inquiry often resolves to a single question: whether there is any reason to
think that Congress might be better equipped to create a damage remedy." *Egbert v.
Boule*, 596 U.S. 482, 483 (2022) (declining to imply a right of action under *Bivens*
for a prisoner's First Amendment retaliation claim).

In *Egbert*, the Supreme Court specifically noted that *Bivens*, *Passman*, and
*Carlson* "pre-date [the Court's] current approach to implied causes of action" and
therefore "carry little weight." *Id. at 500-501*. As a result, "a plaintiff cannot justify
a *Bivens* extension based on parallel circumstances with *Bivens*, *Passman*, or

*Carlson* unless he also satisfies the analytic framework prescribed by the last four decades of intervening case law." *Id. at 501* (internal quotation omitted).

In *Ziglar*, the Supreme Court explained how to determine whether a case presents a new *Bivens* context, stating:

> The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new. Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

582 U.S. at 139-40. Importantly, "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 140 S. Ct. at 743.

None of the previous *Bivens* cases decided by the Supreme Court is a perfect match for the facts alleged here, but Mr. Jennings' claim has most in common with the medical deliberate indifference claim raised in *Carlson*, *supra*. The *Carlson* plaintiff was the estate of an inmate who died after prison officials "kept him in [an inadequate] facility against the advice of doctors, failed to give him competent medical attention for some eight hours after he had an asthmatic attack, administered

contraindicated drugs which made his attack more severe, attempted to use a respirator known to be inoperative which further impeded his breathing, and delayed for too long a time his transfer to an outside hospital." *Carlson*, 446 U.S. at 16, n.1. The *Carlson* defendants were the prison's chief medical officer, a nurse that provided treatment, a staff officer who brought equipment for treatment, the Director of the BOP, and the Assistant Surgeon General of the United States. See *Green v. Carlson*, 581 F.2d 669 (7th Cir. 1978)).

Here, Mr. Jennings alleges that Defendant Poynor, an administrative employee, failed to provide him access to his inhaler and prescription medication the day that he was moved to a Medical Observation Cell. However, it is undisputed that Defendant Poynor was only assisting the Infections Disease Coordinator in transferring Mr. Jennings to the Medical Observation Cell. Once Mr. Jennings was placed in the Medical Observation Cell, Defendant Poynor did not supervise Mr. Jennings, and he was not responsible for making rounds, monitoring him, or dispensing medication. Defendant Poynor's limited interaction with Mr. Jennings, *standing alone*, arguably makes this case significantly different from *Carlson* and presents a new *Bivens* context. See *Swinton v. Serdula*, No. 15-CV-47, 2022 WL 3701196, at *5 (W.D.N.Y. Aug. 26, 2022) (new context where defendants had "limited involvement" in plaintiff's pursuit of medical care and "served roles quite

distinct from each of the defendants in *Carlson*"). But there are other differences that set this case apart from *Carlson*.

Mr. Jennings contends he suffered breathing problems during the few hours that he was without his inhaler and prescription medications,[5] and he speculates, without presenting any supporting evidence, that this *may* have caused him long-term problems. Viewing the facts in a light most favorable to Mr. Jennings, Defendant Poyner, an administrative staff member, who had no role in delivering medical care, denied him medication for a brief period, resulting in breathing problems that lasted a few hours. These facts are significantly different from those at issue in *Carlson* and present a new *Bivens* context. See *Armour v. Depaola*, No. 18-CV-3728, ECF No. 56 (N.D. Ill. 2020) (finding new *Bivens* context where plaintiff alleged defendant prevented him from receiving heart medication, but plaintiff received medication four hours later, after which his condition quickly stabilized, and, unlike *Carlson*, the delay in receiving his medication did not lead to death or an ongoing course of incompetent medical care).[6]

---

[5] Again, in a handwritten grievance, Mr. Jennings acknowledged that medical staff provided him some of his medicine the day he moved to the Medical Observation Cell, and he received all of his medicine within 24 hours. *Doc. 58-5 at 27 Id*.

[6] Defendant Poynor correctly observes that many courts have found a new *Bivens* context in Eighth Amendment inadequate medical care cases where the medical condition, care, or injuries at issue were different from *Carlson*. See, e.g., *Washington v. Federal Bureau of Prisons*, No. 5:16-3913-BHH, 2022 WL 3701577 (D.S.C. Aug. 26, 2022) (new context where allegations had "more than merely 'trivial' differences with *Carlson*," and did "not involve a medical emergency," but the "ongoing course of medical treatment of Plaintiff's

The "superficial similarities" between Mr. Jennings' medical deliberate indifference claim and the claim at issue in *Carlson* "are not enough to support the judicial creation of a cause of action." *Egbert*, 596 U.S. at 495. Rather, based on the substantial differences between the facts alleged here and those at issue in *Carlson*, Mr. Jennings' claim presents a new context to which *Bivens* has not been extended.

The next step in the analysis is to determine whether special factors exist which would allow Mr. Jennings' proposed *Bivens* claim to proceed. "If a claim

---

chronic, non-fatal condition"); *Ross v. Sullivan*, No. 1:20-cv000351-HSO-BWR, 2022 WL 6884087, at *7 (S.D. Miss. Aug. 8, 2022) (new context where, among other things, defendants did not mistreat plaintiff's chronic asthma, resulting in death), *adopted by Ross v. Sullivan*, 2022 WL 4131098 (S.D. Miss. Sept. 12, 2022); *Sharp v. United States Marshals Serv.*, No. 5:29-CT003282-M, 2022 WL 3573860, at *7 (E.D.N.C. July 15, 2022) (new context where, among other things, alleged injuries were "vastly different from those in *Carlson*"); *Dissler v. Zook*, No. 3:20-cv-009420-D (BT), 2021 WL 2598689, at *4 (N.D. Tex. May 7, 2021) (new context where plaintiff's claim involved "far less serious injuries" than "the failure-to-treat claim that resulted in a prisoner's death in Carlson"), *report and recommendation adopted*, 2021 WL 2589706 (N.D. Tex. June 23, 2021); *Manzo v. Mateware*, 3:19-CV-812-S-BK, 2021 WL 6284098, at *4 (N.D. Tex. Dec. 13, 2021) ("new context where plaintiff's claims of "'irreversible damage to [his] retina' and partial loss of eyesight . . . is measurably less serious than that in *Carlson*" because the claim did not involve "a significant failure of the medical delivery system that led to the prisoner's death"), *adopted by Manzo v. Mateware*, 2022 WL 48395 (N.D. Tex. Jan. 5, 2022), *aff'd sub nom.*, *Manzo v. Mateware*, 2022 WL 5101930 (5th Cir. Oct. 4, 2022); *Vaughn v. Bassett*, 1:19-CV-00129-C, 2022 WL 4299720, at *3 (N.D. Tex. Sept. 19, 2022) (new context where "alleged permanent disfiguration" was "measurably less serious than that in *Carlson*, as he obviously does not allege a significant failure of the medical delivery system that led to the prisoner's death"); *Martinez v. U.S. Bureau of Prisons*, 5:15-cv-02160-TJH (AFM), 2019 WL 5432052, at *8 (C.D. Cal. 2019) (failure to treat hypertension was "demonstrably different in kind and severity" from Carlson); *Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 65 (E.D.N.Y. 2017), aff'd, 755 F. App'x 67 (2d Cir. 2018) (new context where plaintiff alleged that officials failed to provide dental hygiene supplies and supportive shoes).

arises in a new context, a *Bivens* remedy is unavailable if there are special factors

indicating that the Judiciary is at least arguably less equipped than Congress to weigh

the costs and benefits of allowing a damages action to proceed." *Id. at 492* (internal

quotations and citation omitted). There is no exhaustive list of special factors.

However, the Supreme Court has instructed that "[i]f there is even a single reason to

pause before applying *Bivens* in a new context, a court may not recognize a *Bivens*

remedy." *Id. at 492-93* (internal quotations and citation omitted).

An important special factor is whether "there is an alternative remedial

structure present in a certain case." *Ziglar*, 582 U.S. at 137. "[S]o long as Congress

or the Executive has created a remedial process that it finds sufficient to secure an

adequate level of deterrence, the courts cannot second-guess that calibration by

superimposing a *Bivens* remedy." *Egbert*, 596 U.S. 498. This remains true "even if

a court independently concludes that the Government's procedures are 'not as

effective as an individual damages remedy.'" *Id.*

Mr. Jennings has two potential alternative remedies. First, the BOP's

administrative remedy program offers non-judicial remedies that Mr. Jennings has

pursued. See *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (noting that

administrative review mechanisms provide meaningful redress and foreclose the

need to fashion a new, judicially crafted cause of action, even where administrative

review does not fully remedy the constitutional violation); see also 28 C.F.R. §

542.10(a) (providing that "[t]he purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement").

Second, Mr. Jennings could assert a claim against the United States under the Federal Tort Claims Act ("FTCA") for medical negligence. The FTCA allows individuals injured by the negligent acts or omissions of federal employees acting within the scope of their employment to recover for their injuries by bringing a claim against the United States. 28 U.S.C. § 2679(b)(1); *Hinsley v. Standing Rock Child Protective Servs.*, 516 F.3d 668, 671-72 (8th Cir. 2008) (citing 28 U.S.C. § 1346(b)). Although an inmate cannot recover for intentional acts or omissions of a federal employee under the FTCA, and FTCA actions can only be brought directly against the United States, the FTCA qualifies as a "remedial structure" that provides an avenue for redress. See *Corr. Servs. Corp.*, 534 U.S. at 69 ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability."); *Farah*, 926 F.3d 492, 502 (8th Cir. 2019) (noting that remedies that provide no compensation for victims and little deterrence for violators still trigger the general rule alternative remedies preclude a Bivens remedy).

Furthermore, the Supreme Court recently declined to recognize a new *Bivens* action for First Amendment retaliation claims because doing so would increase

social costs, including "the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Egbert v. Boule,* 596 U.S. 482, 499 (2022). The same reasoning cautions against extending *Bivens* to Mr. Jennings' claim.

Finally, in 1995, Congress passed the Prison Litigation Reform Act (PLRA) to reduce the quantity and improve the quality of prisoner lawsuits. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). In *Ziglar*, the Court noted that Congress's decision not to include a standalone damages remedy against federal jailers, arguably suggests that Congress chose not to extend *Bivens* damages to a new context. 582 U.S. at 149.

In this case, special factors counsel against extending *Bivens* to the new context presented by Mr. Jennings' medical deliberate indifference claim. *Id. at 148*. Therefore, Defendant Poynor is entitled to summary judgment on that basis.

### D.    Medical Deliberate Indifference

Even if the Court concludes that Mr. Jennings may proceed with a *Bivens* claim, he fails to come forward with facts from which a reasonable jury could find deliberate indifference.

### 1.    Qualified Immunity

Qualified immunity protects government officials from personal liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have

known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome the defense at the summary judgment stage, a plaintiff must show: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009).

Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 129 (2009).

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (omitting quotations and citation). At the summary judgment stage, Mr. Jennings "must clear a substantial evidentiary threshold" to show that Defendant Poynor acted with deliberate indifference. *Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019). An inadvertent or negligent failure to provide adequate medical care does not amount to deliberate indifference. *Id. at 575*. Instead, deliberate indifference requires culpability akin to criminal recklessness, which is more blameworthy than negligence but "something

less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

Defendant Poynor submits the affidavit of Kathy Cook, FCL-FCI's Infections Disease Coordinator. *Doc. 58-1*. Ms. Cook testifies that: (1) on June 29, 2020, she made the decision to move six inmates, including Mr. Jennings, to Medical Observation Cells (*Id. at 2*); (2) Defendant Poynor assisted her in transferring those inmates (*Id. at 3*); (3) staff instructed inmates to bring only the property needed for a 24-hour time period (*Id.*); (4) once the inmates were placed in the Medical Observation Cells, "they were not to be let out and infection control protocols would not have permitted staff members to dig through the infectious inmates' property, as it was considered contaminated" (*Id.*); (5) "Jennings was provided with his inhaler and all doses of his daily medications in time for his evening doses on June 29, 2020, and all his medications were refilled the following day" (*Id. at 6*); and (6) "[a]t no point, therefore, during his stay in the Medical Observation Cell from the afternoon of June 29th to the morning of July 3rd, 2020, did Jennings miss any doses of his medications" (*Id.*).

In his response in opposition to summary judgment, Mr. Jennings alleges that: (1) Defendant Poynor slammed the door closed after he entered the Medical Observation Cell (*Doc. 63 at 3*); (2) Defendant Poynor immediately told Mr. Jennings that he would order his medications (*Id.*); (3) when Defendant Poynor

returned to Mr. Jennings' cell, "he left laughing" (*Id.*); (4) the next time Defendant Poynor came to his cell, he ignored him (*Id.*); (5) Mr. Jennings did not receive his medication and inhaler until he was released from the Medical Observation Cell; (6) he "personally saw Mr. Poynor tell Sheryl Phillips RN not to give [him his] prescription medication" (*Id. at 5*); and (7) his medical records have been altered or are inaccurate. *Doc. 64 at 4-5.*

For Mr. Jennings' version of events to be true, the following would have to be false: (1) multiple medical records showing that he received his inhaler and other medications during his four-day stay in the Medical Observation Cell; and (2) his prior grievance allegation that he was only without his "missing medications" for 24 hours (*Doc. 58-5 at 27*). Mr. Jennings' new allegations are contradicted by the significant evidence offered by Defendant as well as Mr. Jennings' own written grievance against Defendant Poyner. "When [as here] opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); see also *Thomsen v. Ross*, 368 F.Supp.2d 961, 972 (D. Minn. 2005) (a party's inconsistent recollections that contradict his "earlier sworn statements" or "personal notes taken near the event" are insufficient to create a material issue of fact that will avoid summary judgment); *Howard v. Columbia Pub. Sch. Dist.*, 363

F.3d 797, 800 (8th Cir. 2004) (explaining that a court is not required to "accept unreasonable inferences or sheer speculation as fact").

Even if a jury credited Mr. Jennings' latest version of his story and believed all the medical records are inaccurate or fabricated, there is no evidence showing that Defendant Poyner's actions on the one day he interacted with Mr. Jennings rise to the level of a constitutional violation. To prevail on a deliberate indifference claim, Mr. Jennings must come forward with evidence to allow a jury to conclude that Defendant Poyner knew that Mr. Jennings needed his inhaler and deliberately disregarded a serious risk to his health. *See Vaughn v. Greene County, Ark.*, 438 F.3d 845, 850 (8th Cir. 2006). It is undisputed that Defendant Poyner's job duties did not include ordering, distributing, or handling medication. There is also no dispute as to the limited purpose for which Defendant Poyner interacted with Mr. Jennings on June 29. Assuming Defendant Poyner refused to give Mr. Jennings the bag containing his asthma inhaler on June 29th, as alleged, such conduct is insufficient to create a material dispute of fact for trial on the question of medical deliberate indifference.

Finally, Mr. Jennings alleges that he "felt like he was suffocating" (*Doc. 71 at 2*) without his inhaler and he continues to require cardiac care to this day (*Doc. 1 at 2*). However, he has failed to "'place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment.'" *Laughlin v. Schriro*,

430 F.3d 927, 929 (8th Cir. 2005) (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)). At the summary judgment stage, such an omission is fatal to Mr. Jennings' medical deliberate indifference claim. See *Corwin v. City of Independence, MO*, 829 F.3d 695 (8th Cir. 2016) (summary judgment appropriate where pretrial detainee failed to produce verifying medical evidence showing a detrimental effect due to delay in medical treatment); and *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 2001) (a prisoner must demonstrate that the delay in obtaining medical treatment adversely affected his prognosis, or that defendants ignored an acute or escalating situation).

Based on this record, Mr. Jennings has failed to present any evidence to create a dispute of material fact that he suffered any constitutional deprivation as a result of Defendant Poynor's conduct. Therefore, Defendant Poynor is entitled to qualified immunity on Mr. Jennings' medical deliberate indifference claim.[7]

## IV. <u>Conclusion</u>:

IT IS THEREFORE RECOMMENDED THAT:

1.    Defendant Poynor's motion for summary judgment (*Doc. 56*) be GRANTED.

---

[7] Mr. Jennings' failure to create a material issue of fact as to whether Defendant Poynor violated his constitutional rights prevents him from establishing either individual or official liability. See *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005) (explaining that the Eighth Circuit has consistently recognized that a plaintiff cannot succeed with an official capacity claim without individual liability for an underlying substantive constitutional violation).

2.     Mr. Jennings' claims be DISMISSED, with prejudice.

3.     The Clerk be instructed to close this case.

Dated 6 March 2024.


_____
UNITED STATES MAGISTRATE JUDGE